UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VIVIAN D. BANKS ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Civil Action No. 04-1545 (RCL) |
| ) | |
| DISTRICT OF COLUMBIA ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## MEMORANDUM OPINION

Before the court is the District of Columbia's motion for summary judgment [35] on the claims of Vivian Banks in her action [11] brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-16(a), the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §633a(a) and the Due Process Clause via 42 U.S.C. §1983. Plaintiff has failed to show that she and her nurse manager were similarly situated and therefore, she cannot prevail on her claims of either gender or age discrimination. Consequently, the defendant's motion for summary judgment [35] must be GRANTED. Because the plaintiff has not established a *prima facie* case of discrimination, her § 1983 claim is also denied.

### I. Factual Background

Plaintiff, Vivan Banks, is a 62-year-old African-American female[1] who was hired by St. Elizabeth's Hospital in June 1998 as a Nurse, Team Leader for the Department of Mental Health. (Banks Dep. at 7, July 21, 2006.) The case at hand involves the events of December 14, 2001 in

---

[1] Plaintiff was 57 at the time of the incident. (Banks Dep. 6.)

which plaintiff was assigned as charge nurse on Admissions ward 6 from 7:00 a.m. to 3:30 p.m. (*Id.* at 18.) Lewis Mayo was the nurse manager assigned to ward 6 on that day, and also served as Banks' supervisor. (*Id.* at 59.) On that day, Patient #141528, who had a history of threatening and disruptive behavior, obtained a knife on two separate occasions, and engaged in dangerous behavior.[2] In the first incident, the patient ran into the nurses' station kitchenette, grabbed a knife, and threatened to kill herself. (Banks Dep. 30.) A few hours later, a knife fell out of the patient's pocket as she ran toward and grabbed Mildred Jones, a nursing assistant. (Banks' Test. Before Hr'g. Officer Rotella 24, May 9, 2002.)

The personnel assigned to the unit that day included, the plaintiff, Lewis Mayo (nurse supervisor), and anywhere from one to two registered nurses ("RNs"), and three to six psychiatric nursing assistants ("PNAs"). (Banks Dep.18-19.) The minimum staffing requirement for a unit of 23 patients is 1 RN and 3 PNAs. However, on the day in question, the unit had 29 patients. (Banks Dep. at 19, 44, 87.) Vivan Banks, the plaintiff, was responsible for completing the CMHS Nursing Assignment Sheet for staff assigned to the unit. (*Id.* at 18-19.) Mayo is the nurse manager for the unit, and also has administrative duties which he periodically leaves the unit to attend to. (*Id.* at 49.) While he is away, Mayo is available by pager should he be needed. (Mayo Dep. 33, 34, May 16, 2006.)

At 7:00 a.m., when her shift started, plaintiff charged Mildred Jones with providing "one-to-one" contact with Patient #141528, which she recorded on the CMHS Nursing Assignment Sheet. (Def. Ex. B; CMHS Nursing Assignment Sheet.) This type of observation is regarded as

---

[2] The knife was likely the same one used earlier in the day to cut a birthday cake for one of the employees. Knives are normally not available in the ward. (Banks Test., at 26; Def. Ex. N, Banks' Resp. to Summ. Removal.)

unofficial when it is given by a nurse instead of a doctor.  A nurse providing one-to-one contact must observe the patient and retrieve various things the patient may need.  (Banks Dep. 28.)  The observation continued until approximately 12 noon when the first incident with Patient #141528 occurred.  At the time, the unit was staffed by 1 RN and 3 PNAs, and Banks.  (*Id.* at 62.)  Mr. Mayo, the nurse manager, had left at 11:00 a.m. to go to lunch.  (Mayo Dep. 33, 34.)

After the episode, Marina Bota, M.D. prescribed two mgs of Ativan for the patient[3], along with official one-to-one contact.[4]  (Banks Dep. 36.)  However, plaintiff failed to record the official order of one-to-one contact on the patient's medical record. (Banks Dep. 96, 97)  This resulted in subsequent problems because when Jones came back from lunch, she was under the impression that she was still providing only unofficial one-to-one contact and not official contact.  (Banks' Test. Before Hr'g. Officer Rotella 23. )  Mr. Mayo was paged and he responded and filed an Unusual Incident Report.  (Def. Ex. J;Unusual Incident Rep., Dec. 14, 2001.)  Mayo did not order any additional staff to the unit, and left the unit again sometime before 2:00 p.m.  Plaintiff requested additional staff immediately after the incident to help administer medication to the patient, which she obtained. (Mayo Dep. at 40-41.)  Plaintiff allowed nurse Jones to go to lunch at 2:15 p.m. and took over the one-to-one contact herself.   Plaintiff did not request additional

---

[3] Ativan, a sedative, is typically given along with Haldol, an anti-psychotic.  However, on this day, Haldol was not prescribed after the first incident due to new guidelines.  (Banks Dep. at 33-36.)

[4] When a physician, instead of a nurse, orders one-to-one contact, it is considered "official" and therefore, the person providing the care must abide by more extensive requirements.  First, he must keep the patient "within arm's reach at all times, including personal hygiene and bathroom activities."  Second, the staff member must only be assigned the task of one-to-one care, and cannot be charged with doing more.  Lastly, the manager must make sure that one-to-one care is maintained during staffer's break and meal times, to assure constant observation.  (Def. Ex. H, CMHS Policy 50000.311.)

staff at this time, despite the fact that she was being called away from the patient to answer the phone and respond to others' requests. (Banks' Test. Before Hr'g. Officer Rotella 23-24.)

At 2:45 p.m., Ms. Jones returned from lunch and was met with another incident regarding the patient. Plaintiff testified, "I heard Jones yelling and when I opened the door to the break room that the staff uses, [Jones] said the knife had fallen out of the patient's pocket." (Banks' Test. Before Hr'g. Officer Rotella at 24.) Now, Ativan and Haldol were prescribed, and the patient was placed in seclusion. (Def. Ex. I; Medical Record, Doctor's Orders, Dec. 14, 2001.) Plaintiff was unable to prepare a report on the incident because she needed to leave the hospital by 3:45 p.m. that day for an appointment. (Banks' Test. Before Hr'g. Officer Rotella at 53.) However, plaintiff worked the next two days (December 15th and 16th) and still did not file a report. (Banks Dep. at 68.) Plaintiff filed a report on December 19th which stated that no person in particular was assigned to perform the one-to-one contact with the patient. (Def. Ex. K.; Banks Report, Dec. 19, 2001.)

After the hospital conducted an internal investigation, DMH found that plaintiff was negligent in her duties and on January 10th, 2002, Banks was summarily removed from her position for inexcusable neglect of duty. Def. Ex. M. Plaintiff contested the findings in an administrative hearing before Hearing Officer Rotella, Jr. The Hearings Officer found that Plaintiff (1) "failed to ensure one-to-one contact in accordance with Dr. Bota's order" or reflect any assignment of the official one-to-one in the patient's records; (2) "PNA Jones provided uncontradicted testimony that, prior to 2:45 p.m., she was merely 'keeping an eye' on [the] patient" pursuant to plaintiff's request at the beginning of the shift; (3) plaintiff could not have provided adequate one-to-one contact during any of the time in question" because plaintiff failed

to stay within arm's reach of the patient and undertook other tasks during her self assignment; (4) plaintiff failed to "timely document in Patient #141528's medical record the details of the two incidents that took place on December 14." (Def. Ex. O; Hr'g Officer Rep. to Deciding Official, 10, Aug. 27, 2002.)  Subsequently, the HO issued a recommendation that plaintiff be issued a written reprimand for neglect of duty, that she be reinstated to her former position on a probationary basis, and also that she be reimbursed for lost wages. (Def. Ex. Q; Banks' Performance Evaluation.)

On June 13, 2003, Martha Knisley, the Director of the D.C. Department of Mental Health issued a final ruling on the matter.  She suspended the plaintiff for 9 days, from December 27, 2001 to January 4, 2002,  and restored her to her former position with back pay for the period of January 5, 2002 to June 14, 2003.  (Def. Ex. P; Pl.'s Disciplinary Determination.)

Plaintiff has brought suit alleging that the defendant discriminated against her by summarily removing her and suspending her for nine days without pay.  Plaintiff seeks lost wages and benefits plus interest, and damages for pain and suffering due to humiliation, depression, anxiety and loss of self-esteem. (1st Am. Compl. at 7.)

## II. Legal Standards

A motion for summary judgment can only be granted if, "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgement as a matter of law." Fed. R. Civ. P. 56(c).  In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court further defined when summary judgment is appropriate.  Only if no reasonable juror could find for the non-moving party can the court grant summary judgment. 477 U.S. 242, 248 (1986).  Further, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine

the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* The court must also view the evidence in the light most favorable to the plaintiff, the non-moving party. *Borgo v. Goldin*, 204 F.3d 251, 254 (D.C. Cir. 2000).

Plaintiff has brought a claim under Title VII of the Civil Rights Act of 1964 for gender discrimination, and under the ADEA for age discrimination. Title VII states, "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-(2)(a)(1). While this section only applies to private employers, the act charges federal agencies with compliance via § 2000e-16(a). In *Singletary v. Dist. of Columbia*, the court held that this included District of Columbia agencies as well. 351 F.3d 519, 523-24 (D.C. Cir 2003). The text of the ADEA states, "All personnel actions affecting employees or applicants for employment who are at least 40 years of age...in executive agencies...be made free from any discrimination based on age." 29 U.S.C. § 633a(a).

Because plaintiff has not alleged any direct evidence of either gender or age discrimination, the court must follow the shifting burden of proof standard set forth first in *McDonnell Douglas Corp. v. Green*, to determine whether her case can survive summary judgment. 411 U.S. 792, 802-805 (1973). *See, Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007); *Paquin v. Federal National Mortgage Assoc.*, 119 F.3d 23, 27 (D.C. Cir. 1997); *See also*, *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (the *McDonnell*

*Douglas* standard applies to ADEA claims)   First, the plaintiff must establish a *prima facie* case of discrimination by a preponderance of the evidence.  *Weldon v. Kraft, Inc.*, 896 F.2d 793 (3rd Cir. 1990) (citing *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)).  Then, the burden shifts to the defendant who must "articulate some legitimate, nondiscriminatory reason" for the disparate treatment.  The defendant only has the burden of production, not of proof.  If this is satisfied, "the McDonnell Douglas framework...disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142-143 (2000).  The burden again shifts to the plaintiff, and she must show by a preponderance of the evidence that the defendant's offered reason is pretextual, and that discrimination was really afoot.  *See*, *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc) ("[To] survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason").

### III. Analysis

In order to establish a *prima facie* case of discrimination, the plaintiff must show: "(1) that she is a member of a protected class, (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir 2002) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).  Banks has proved that she is a member of the protected class because she is a woman over 40.  (Banks Dep. at 6.)   Further, her summary removal and nine day suspension without pay can certainly be described as an adverse employment action.  An " adverse employment action" within the meaning of *McDonnell Douglas* is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision

causing significant change in benefits." *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998)).  *See also*, *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, (D.C. Cir. 2007) (affirming lower court decision that assignment of a brochure project deadline that did not increase employee's overall workload was not an adverse employment action).

The "inference of discrimination" requirement demands a more in-depth look at the claims of each of the parties.  A claimant may sustain the third prong of her *prima facie* case by either (1) showing that she was similarly situated to an employee who was not a member of the protected class, and she was treated differently from this similarly situated employee, *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999); or (2) that the employee's dismissal was not due to "the two most common legitimate reasons " an employer could have for discharging an employee.  *Stella* at 145.  These reasons being, "performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005).

Whether or not two parties are "similarly situated" is typically a question for the jury. *George v. Leavitt*, 407 F.3d 405, 414-15 (D.C. Cir. 2005) (citing *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2nd Cir. 2000) and *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1555 (D.C. Cir. 1997)).  However, in this case, plaintiff cannot allege that she is similarly situated to Mayo because she does not hold the same position as he.  In *Phillips v. Holladay Property Servcs. Inc.*, the court stated, "to be similarly situated, individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct ..." 937 F.Supp 32, 37 (D.D.C. 1996).

Plaintiff is herself a nurse, and just like the other staff nurses and psychiatric nursing assistants, she is under the supervision of Lewis Mayo, the nursing supervisor. (See, Pl. Ex. 3; Supervisory Psychiatric Nurse Position Description.)  Plaintiff cannot possibly make out a case that she was similarly situated to Mayo because there is a difference of 7 grade levels between their positions. Mayo is a Grade 12 and plaintiff only a Grade 5. (*Id.*; Pl. Ex. 5; Report of Performance Rating.) The court would be hard pressed to find two employees with such different grade levels that were still subject to the same standards and engaged in the same conduct.  The main purpose of such a system is to assign jobs with different responsibilities a numerical value so that they can be easily identified and compared.

     Both Banks' and Mayo's depositions shine further light on the subject of their varying duties.  Banks' main responsibilities include supplying nursing care to patients and providing leadership to people under her.  (Banks Dep. at 8.)  However, Banks also states that she did not act as an official supervisor of the other nurses in the unit, Mayo is the hospital employee who holds this position.[5] (*Id.* 8, 9.)  Furthermore, while plaintiff only doles out assignments to the rest of the nursing staff, Mayo has the power to initiate and/or review corrective action and promotions. (Pl. Ex. 3; Position Descripton.)  Mayo also ensures that the team leaders are fulfilling their duties and drafts the broad task outline for the unit. *(Id.)*  Therefore, while plaintiff and Mayo both have some degree of control over the nursing staff, Mayo's responsibilities heavily outweigh plaintiff's.

---

[5] (*See*, Banks' Dep. 8, 9.) "Q: Do you supervise any employees? A: Not really, no. Well, quasi supervision.  Quasi supervision.  Q: What do you mean by that?  A: I do the assignments and see that certain tasks are carried out by the people under me.  But they do have a nurse supervisor [Mayo]."

Plaintiff cites *Miller-El v. Dretke*, 545 U.S. 231 (2005) and *Cones v. Shalala*, 199 F.3d 512 (D.C. Cir. 1999) as authority that the question of whether Mayo and plaintiff were similarly situated must be left up to the jury because they both had some responsibility over the unit. (*See*, Opp. at 12, 13.) To apply these cases to the facts at hand is to make a gross overstatement of the similarities between Mayo and Banks. In *Cones*, the comparable employees were an acting GS-15 and a permanent GS-15, both the same grade level. In *Miller-El*, the Supreme Court noted that they have never declared a rule that in a *Batson* claim, "similarly situated" jurors must be identical in all respects. *Miller-El*, at fn. 6. It is true that "similarly situated" does not require that plaintiff be identical to Mayo, but she must still have similar employment responsibilities as he. Defendants are not claiming that Mayo and plaintiff have to be identical, thus *Miller-El* does not help plaintiff's case.

Further, plaintiff has not been able to establish an inference of age discrimination based on comparing herself to similarly situated employees, because she cannot specifically name any such employee.[6] Nor can she compare herself with Mayo because he is within the protected class. (*See*, Def. Ex. R, Mr. Mayo's Miltary.)

The third prong of the prima facie requirement can also be satisfied by showing that the employee's dismissal was not due to, "performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether." *George v. Leavitt*, 407 F.3d 405, 412

---

[6] Plaintiff cannot name specific parties that engaged in similar employment activities and were not terminated or punished for their actions. At most, she names them as social workers, a medical records technician, and a recreational therapist. While this may be enough information to survive a Rule 12(b)(6) challenge, plaintiff has not offered enough evidence for the jury to determine whether they were similarly situated. See, 1st Am. Compl. at ¶ 20;

(D.C. Cir. 2005).   It is erroneous to assume that the third prong cannot be satisfied by only alleging that the discharged party was treated differently than a similarly situated employee.  *Id.* at 412 - 413 (stating that the district court erred in interpreting the third prong as having only the "similarly situated" meaning because that would require more than is needed to create an inference of discrimination).  However, this alternate way of satisfying the third prong must still be viewed with the understanding that the plaintiff must ultimately persuade the trier of fact that the defendant intentionally discriminated against her.  The court in *George* emphasized, "[T]he central focus of the inquiry in such cases is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex or national origin." 407 F.3d 405, 411 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 98 S.Ct. 2943 (1978)).

Bearing this in mind, the Court finds that plaintiff has not been able to put forth enough evidence showing that her suspension was not due to her inadequate performance.  The facts show that plaintiff did indeed perform below her employer's legitimate expectations, and her subsequent removal and suspension without pay were a direct result of this.  Plaintiff made several errors that could not be classified as satisfactory employee performance.  First, Banks fully admits that she failed to timely record Dr. Bota's order of official one-to-one contact on Patient #141258's medical record. (Banks Dep. at 95, 96.)  As a result, Ms. Jones merely "kept an eye" on the patient until the second incident at 2:45 p.m. (Def. Ex. O at 10; Hr'g Officer's Rep. To Deciding Official.)   Further, plaintiff was aware that failing to update patient's records was not up to her employer's legitimate expectations.  The hospital notified her of this in her

performance evaluation for the period of April 1, 2000 to March of 2001.[7] (Def. Ex Q, Pl.'s Performance Evaluation.)

Secondly, even though she knew that Dr. Bota had ordered an official one-to-one contact with the patient, Banks did not ensure one-to-one contact.  Plaintiff Banks testified that she was constantly pulled away from the patient because she needed to answer the phone and give keys to the evening shift to count out medication from the drug cabinet.  (Banks Dep. at 23-24.)  Plaintiff argues that this is pretext for discrimination because she used a medical student to supplant the one-to-one contact (stay within an "arm's reach") while she was pulled away.  While Dr. Bota testified that a supervised medical student could perform this task, it could only be for a very short amount of time, e.g. ten minutes or so.  (Dr. Bota's Test. before Hr'g Officer Rotella, 73, May 9, 2002.)  There is evidence that Plaintiff left the medical student with the patient for longer periods of time.  Plaintiff allowed a medical student to interview the patient while Mildred Jones went to lunch, between 2:15 and 2:45.[8]  (Banks' Test. before Hr'g Officer Rotella, 23, May 9, 2002.)  In this time, Banks knew she was supposed to ensure that the patient was under one-to-one observation, but neither did she assign another nurse to the patient nor provide adequate coverage herself.  Plaintiff and a medical student were observing the patient, but plaintiff was continuously being pulled away to perform other tasks.  (Banks' Test. at 24.)  Further, at 2:45 p.m., plaintiff allowed the medical student to take the patient into the back office which is what

---

[7] The notes in the evaluation include, "[Banks] needs to build up her leadership skill[s] and provide on-going direction to other staff members [and] improve documentation in a timely manner." (Def. Ex Q, Pl.'s Performance Evaluation.)

[8] In fact, Jones told plaintiff that she was only going to the ATM and would be gone 15 minutes.  The nurses counted it as "lunch" in the report. (Banks' testimony before Hearing Officer Rotella, at 23, May 9, 2002.)

allowed her to obtain a knife from the kitchen for a second time. (Banks' Resp. to Summ. Removal, at 2, Jan. 23, 2002.)  Thus, plaintiff was going to allow a medical student to provide the one-to-one contact for an even longer period, and out of Banks' sight.  Presumably this was not what Dr. Bota had in mind when she said a medical student could provide one-to-one contact for a "short amount of time."

### IV. Conclusion

Plaintiff paints a picture of an understaffed, overworked Hospital ward that had come to its breaking point.[9]  There is evidence that St. Elizabeth's was understaffed, and the employees were overworked.  However, while the hospital probably shares some of the blame for the day's events, plaintiff has failed to show that her employer discriminated against her on the basis of gender or age.  Every poor decision and instance of unfair treatment by an employer does not amount to *per se* discrimination.  There is simply no evidence that such was the case in plaintiff's removal and suspension.[10]  A reasonable jury could not infer discrimination from the facts alleged.  Therefore, defendant's motion [35] for summary judgement will be GRANTED.

A separate order shall issue this date.

---

[9] Banks states, "St. Elizabeth's Hospital management is quick to tell the nurses "I have no more staff to give you.  Do the best you can do.'" Also, 2001 and 1999 surveys conducted by the Heath Care Finance Administration show that the hospital was "grossly understaffed." (Banks' Resp. to Summ. Removal, at 3.)

[10] Plaintiff says herself that she may have been used to set an example to other employees.  If the hospital did in fact punish everyone and anyone who made a mistake, then this is concrete evidence that plaintiff was not treated differently because of her gender or age. (Banks' Resp., at 4.) ("[W]ith an administration out to prove their worth by the number of people they fire as part of a 'shake-up' at St. Elizabeth's Hospital any and all incidents involving patient care becomes an event worthy of firing.")

Signed by United States District Judge Royce C. Lamberth, August 1, 2007.